PEOPLE v. BURTON et al.

(Supreme Court, General Term, Fourth Department.　May 18, 1894.)

1. ARSON—EVIDENCE.
　　On a trial for arson it appeared that during the night of the fire defendants were carousing about the village, and were refused beer at a place in a building adjacent to which, and within the curtilage, was the structure fired; that they were angry at such refusal, and were heard to talk about burning a building; and one of them said "there will be a hell of a time around there in a few minutes," and that the fire broke out within half an hour afterwards.　*Held*, that the evidence was sufficient to submit to the jury the question of defendants' guilt or innocence.

2. SAME—CONDUCT OF DEFENDANTS BEFORE FIRE.
　　In such case, evidence of the movements of defendants during the night, and just before the breaking out of the fire, is admissible.

Appeal from court of Oyer and terminer, Otsego county.

Harry Burton and Frank Clapper were convicted of arson, and appeal.　Affirmed.

The indictment charged defendants with having, on the 14th day of June, 1892, at the town of Oneonta, committed the crime of arson in the second degree, by having in the nighttime, willfully, maliciously, and feloniously set on fire, with intent to burn the same, a building not inhabited, to wit, a blacksmith shop, there situate on Main street, in the village of Oneonta, belonging to and owned by Ann Elizabeth Amsden, and adjoining and within the curtilage of an inhabited building known as the "Lacey Block," in which there was at the time thereof divers human beings, endangering the said Lacey block and the lives of the occupants thereof; and thus having violated section 487 of the Penal Code.　After the verdict was received in the court of sessions, where the trial took place in December, 1892, a sentence was pronounced that the defendants be imprisoned for the term of six years and six months, and upon the conviction and sentence judgment was entered, and a bill of exceptions was prepared and settled and ordered filed in the office of the clerk of the county of Otsego, and annexed to the judgment roll.　The defendants appeal to this court "from judgment of conviction rendered against them on the 8th day of December, 1892."

Argued before HARDIN, P. J., and MARTIN and MERWIN, JJ.

Gibbs & Wilbur, for appellants.
Frank L. Smith, Dist. Atty., for the People.

HARDIN, P. J.　From the evidence it appears that the blacksmith shop mentioned in the indictment is a wooden building, and was discovered on fire at the rear end thereof, and being situated within about three feet of the Lacey block, which is also a wooden building, and the roof of the blacksmith shop is built into or against the Lacey block.　The description of the location of the buildings and their situation with respect to each other sufficiently indicates that the fire in the blacksmith shop endangered the Lacey block. The fire was discovered about 4 o'clock in the morning of June 14th, on the outside of the blacksmith shop, at the rear end thereof; and the circumstances attending the discovery of the fire sufficiently indicate that it was caused by an incendiary act, and warranted the jury in finding the fire was incendiary.　The evidence also indicated that the defendants had spent the larger portion of the night in and

about the village, drinking and carousing, and that they had passed these premises several times during the night, in company with each other; and that about 2 o'clock preceding the fire one of the defendants endeavored to obtain beer from one Hecox, who conducted the business of bottling beer in the basement of the Lacey block, next to the blacksmith shop, and that, upon being refused, he became angry. The defendants were in company with one Osterhout and others a portion of the night preceding the discovery of the fire, and had been drinking very extensively in the yard of the boarding house, where one of the defendants boarded, about 1 o'clock at night, when they were driven out of the yard by the keeper of the boarding house. Subsequently, in company with Osterhout, they went up the street, passing in the vicinity of the blacksmith shop; and when they reached the Windsor Hotel one of the defendants got possession of six bottles of lager beer, after drinking some at the hotel; and that, after obtaining the bottles of beer, they went back down Main street, passing the blacksmith shop, and halting near the residence of Barnes, where they continued their drinking. In speaking of the movements of the defendants, Osterhout testifies:

"We went down Main street, by this blacksmith shop, and down to and in front of the residence of A. M. Barnes, the undertaker, and there is a low stone wall next to the sidewalk. We drank the lager up, laid the bottles on the bank. I said I would fetch the bottles back, and they proposed to set the building afire. I can't tell which one spoke first. They both talked about it. They did not say what building. They didn't say with reference to any wooden building. They said they wanted to set fire where it would make the biggest fire. They said I had better go along. I told them I wouldn't, and got up, and picked up the bottles, and went back to the Windsor. They got up, and started in the opposite direction, as I started up the street. I started up the street, and went to the Windsor Hotel, and they started towards the railroad track."

It appears by this witness that upon reaching the Windsor Hotel a conversation was had, and the witness continues:

"I heard one of them say,—I can't tell which one it was,—said 'There will be a hell of a time around there in a few minutes.' I can't say whether it was Clapper or Burton that said that. They were both present when one of them said it. They went right out. Didn't stay there over five minutes, I don't think. They went out together. I couldn't say how long after they went out before I heard an alarm of fire. Oh, it might have been twenty minutes or half an hour. It might not have been so long as that. The alarm I heard was, Bissell went up stairs to call the help, came down stairs, and he says, 'By God, there is a fire out there.' Fred Bissell, the clerk, said so. I went out doors then, and I saw the fire in back there. I couldn't tell just exactly where it was then. It was down on Main street. The hose cart came down along there, but I could see the fire on the rear of the blacksmith shop from the Windsor when I came out."

We think the evidence produced upon the trial was such that the court was required to submit the question of the guilt or innocence of the defendants to the jury, and that there is sufficient evidence in the case to warrant the finding made by the jury.

2. We think no error was committed by the trial court in receiving evidence of the movements and acts of the defendants during the night at a short period prior to the breaking out of the fire. The declarations of the defendants were not received for the purpose of

establishing an independent crime, but rather with a view of establishing the condition of mind they were in. As said in People v. Everhardt, 104 N. Y. 595, 11 N. E. 62:

"Such proof is not received for the purpose of showing other crimes than that charged in the indictment, but for the purpose of showing the guilty knowledge and intent, which are elements of the crime charged."

3. We are of the opinion that the court committed no error in refusing to advise an acquittal of the defendants at the close of the evidence offered by the people. The learned counsel for the appellants endeavors to escape the force of some of the evidence given by the people upon the suggestion that some of the admissions made are to be taken with caution, and calls our attention to Law v. Merrills, 6 Wend. 277. In that case it was said that "evidence to establish a fact by the confessions of the party should always be scrutinized, and received with caution." We assent to the doctrine, and we must assume that the jury performed its duty in scrutinizing, weighing, and comparing the admissions shown to have been made with all the facts and circumstances appearing in the case. Our attention is also invited to Garrison v. Akin, 2 Barb. 27, where Judge Harris, in speaking of admissions, says:

"It is so easy, too, by the slightest mistake or failure of recollection, totally to pervert the meaning of the party, and change the effect of his declarations, that all experience in the administration of justice has proved it to be the most dangerous kind of evidence, always to be received with great caution, unless sustained by corroborating circumstances. Then, indeed, the character of this species of evidence is changed, and the mind receives it without suspicion."

We think it was, within the spirit of that authority, the duty of the trial judge to submit the force and effect to be given to the declarations or admissions of the defendants to the jury, and that no error was committed in that regard.

4. Defendants called one Jones as a witness, who was a baker by trade, and the bakery in which he was at work on the night of the fire was in a small store in the basement on the opposite side of the street from the blacksmith shop, and a little further east; and he testified that about 10 o'clock of the night in question the defendant Clapper entered his shop, and that Burton was on the sidewalk; and that he saw him, after that, in the bake shop, at half past 12, and received from him a couple of bottles of beer; and that he next saw him, about half past 3 or 20 minutes to 4, coming across the railroad track on Main street, coming towards the bakery, and from the direction of Mrs. Martin's, where he was boarding, and that Burton was with him. The witness continued: .

"They were wrestling and punching each other, as boys would that had a little in them. Burton couldn't get along very well. I couldn't say whether they got down in the dirt. They were tumbling around there quite a little this side the crossing. When crossing there they were on the sidewalk and in the highway both. That was at half past three, and I was in the bake-shop door. I next saw them, after seeing them at the crossing, come up by the old blacksmith shop, on the other side of Main street (I don't know who owns it), by Mrs. Fox's millinery store, which is on the same side of the street as the bakery. I was in the door of my bake shop. They came right along up past

Grove street, and down to me, and past the blacksmith shop in question. They stopped there, and Mr. Clapper came down to me, and got a few cakes,—cookies I had baked, that lay on the table. He wanted to get money of me. I should say he was there about twenty minutes. He ate some cookies, and was monkeying with the bread, and wanted to get some money of me. * * * When they left my bakery it was about five minutes to four, which was the last I saw of them until I went home to breakfast. I heard the alarm of fire. I was the first that heard it, about five, eight, or ten minutes, or something like that, after defendants left me."

This witness was very extensively cross-examined as to all the circumstances mentioned by him in his testimony in chief, and as to the surrounding obstacles and buildings, and as to the maneuvers and whereabouts of the defendants; and when the district attorney was summing up, the defendants' counsel asked the court to direct the district attorney "that there is no evidence in this case that there are buildings to obstruct the vision of the witness Jones from the bake shop to the crossing." The request was refused, and an exception was taken, and the court thereupon remarked, "I will leave it to the jury to say whether there are any buildings or not." In the course of the opinion delivered in People v. Rohl, 138 N. Y. 620, 33 N. E. 933, it was said: "The district attorney had a right to allude to any circumstances disclosed by the evidence, which, in his view, rendered the story of the defendant improbable." See, also, Fry v. Bennett, 3 Bosw. 243. We think the trial court committed no error in refusing to place the restrictions upon the district attorney requested by the defendants.

After the trial judge had delivered a careful charge covering all the essential elements of the case, he was requested to charge "that the jury may and should take into consideration that no motive has been shown on the part of the defendants to commit the offense charged." The court refused the request "upon the ground that it is the province of the jury to say whether there is motive or not from the evidence," to which the defendants excepted.

In Shepherd v. People, 19 N. Y. 544, Judge Denio, in speaking of the ground upon which evidence of motive inducing the commission of a crime in cases resting upon circumstantial evidence is received, says:

"It does not of itself prove anything, but it tends to remove the improbability of his having done an act which he must have known to be wrong."

In People v. Bennett, 49 N. Y. 138, Church, C. J., in speaking for the court, says:

"Motive is an inducement, or that which leads or tempts the mind, to indulge the criminal act. It is resorted to as a means of arriving at an ultimate fact; not for the purpose of explaining the reason of a criminal act, which has been clearly proved, but from the important aid it may render in completing the proof of the commission of the act when it might otherwise remain in doubt. With motives, in any speculative sense, neither the law nor the tribunal which administers it has any concern."

In People v. Trezza, 125 N. Y. 740, 26 N. E. 933, it was said:

"Whether the acts of the accused proceeded from some motive, or from general depravity of mind and a reckless disregard of human life, in either case, in the absence of lawful excuse or justification, if the other elements of the crime charged are proved, a conviction is proper."

In People v. Minisci, 12 N. Y. St. Rep. 719, Smith, P. J., said, in speaking of motive:

"It is enough that the evidence does not absolutely exclude the existence of motives."

We think no error was committed by the trial judge in leaving the question, as one of fact, for the jury to determine,—whether there was a motive for the crime disclosed by the evidence.

Defendants also requested the court to charge "that the defendants are presumed innocent until they are proven guilty, and that the burden of proof rests upon the people to satisfy them beyond a reasonable doubt." This request was refused by the court "upon the ground that he had so charged already," to which refusal the defendants excepted. In the body of the charge it was said: "The defendants are presumed to be innocent until the contrary is proved, and, in case of a reasonable doubt as to the guilt of either of them, that one is entitled to an acquittal." We think the trial judge properly refused to repeat that portion of his charge in response to the request made. The benefit of a reasonable doubt was suggested in the course of the charge, and no rule of law was violated in that regard. Raymond v. Richmond, 88 N. Y. 671. We think the trial court observed the rule laid down in O'Connell v. People, 87 N. Y. 377, and, as was said in that case, "the court could not be required to repeat it [a portion of his charge], or answer again to different portions as analyzed by the counsel."

5. Appellants criticise the testimony of Osterhout, and refer to the testimony of the defendants, and urge upon this court to hold that the jury have found contrary to the testimony of the defendants. We think it was for the jury to determine what credence should be given to Osterhout, and what faith and credit should be given to the defendants as witnesses in their own behalf. In Newman v. People, 63 Barb. 631, it was said: "The degree of credence to which he [the defendant] was entitled was to be decided by the jury, and not the court." In speaking of the force and effect that should be given to the verdict of a jury, it was said in People v. Taylor, 138 N. Y. 398, 34 N. E. 275, that the court will not interfere with it "unless it is clearly against the weight of evidence, or appears to have been influenced by passion, prejudice, mistake, or corruption. The fact that there is, in the judgment of the court, a rational doubt of the guilt of the defendant, is not a sufficient ground for a reversal." Applying the rule thus laid down to the evidence presented in this case, we are of the opinion that the verdict should remain. See section 542, Code Cr. Proc. Conviction and judgment of the court of sessions of Otsego county affirmed, and, after the judgment is entered in the judgment book, a certified copy of the entry shall be forthwith remitted to the clerk of Otsego county, "with whom the original judgment roll is filed," in accordance with section 547, Id. All concur.